Cecil HANSEN, Plaintiff

v.

Larry G. MASSANARI,[1] Acting Commissioner of Social Security, Defendant.

No. 3:01–CV–90002.

United States District Court, S.D. Iowa, Davenport Division.

May 15, 2001.

---

1. Larry G. Massanari became the Acting Commissioner of Social Security on March 29, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Larry G. Massanari should be substituted, therefore, for Commissioner Kenneth S. Apfel, or for Acting Commissioner William A. Halter as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Michael DePree, Davenport, IA, for Plaintiff.

Craig P. Gaumer, Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Cecil Hansen, filed a Complaint in this Court on January 4, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and the Commissioner is ordered to award benefits.

█ Plaintiff filed an application for benefits on October 2, 1997.[2] Tr. at 79–81. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. On March 19, 1999, Plaintiff's counsel wrote to the Administrative Law Judge to inform him that Plaintiff was incarcerated and asked that the case be adjudicated on the record without a hearing. Tr. at 77. Administrative Law

---

**2.** In a decision dated February 17, 1994, an ALJ found that Plaintiff was disabled and entitled to benefits as of the date of an application filed December 15, 1992. Tr. at 44–56. According to the ALJ's October 22, 1999 decision, benefits were terminated in July 1996 because Plaintiff was incarcerated. Tr. at 13.

The ALJ found that there was no evidence presented to warrant reopening the previous determination. This Court is without jurisdiction to review the decision not to reopen a prior determination. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977).

Judge Thomas E. Donahue (ALJ) submitted interrogatories to vocational expert Marian S. Jacobs who responded thereto on August 24, 1999. Tr. at 132–44. The ALJ issued a Notice of Decision—Unfavorable on October 22, 1999. Tr. at 10–31. The ALJ's Decision was affirmed by the Appeals Council of the Social Security Administration on December 4, 2000. Tr. at 5–7. A Complaint was filed in this Court on January 4, 2001.

Plaintiff was seen for a functional capacity evaluation on August 3, 1993, at the University of Iowa's Spine Diagnostic and Treatment Center after he was seen by Ernest Found, M.D. on June 23, 1993 (Tr. at 170). Tr. at 149–69. At the conclusion of the evaluation, Plaintiff was told that he was able to lift 30 pounds not more than four times an hour, and 15 pounds repetitively. Tr. at 149.

Plaintiff was admitted to the Iowa Medical and Classification Center on June 27, 1996, having been convicted of possession with intent to deliver marijuana and sentenced to imprisonment of five years. A review of Plaintiff's record revealed that he had a history of six convictions for disorderly conduct, five for driving while revoked, six for a variety of traffic offenses, three for intoxication and additional convictions for criminal trespass, contempt of court, and open container. Tr. at 183.

Plaintiff was seen by Paul H. Frahm, Ph.D., clinical psychologist, on November 13, 1997. The report indicates that no tests were administered but that Plaintiff had been interviewed extensively. Plaintiff reported that in order to get out of the residential corrections facility, he had taken a job as a dish washer which he held for five months. He quit the job rather than be fired for what can best be described as racist and homophobic remarks directed towards a co-worker. It was noted that Plaintiff completed the 8th grade in special education, and that he could read a little and was able to add and subtract. Tr. at 185. Plaintiff told Dr. Frahm that he spends his days staying in his trailer watching TV and listening to the radio. Tr. at 186. At the conclusion of his report, Dr. Frahm wrote:

> Mr. Hansen has not had any regular employment until he was in the RCF in a highly structured and supervised situation. He was able to maintain employment for several months as a dishwasher, but had trouble with co-workers and said he would have been fired if he had not quit. He has poor impulse control, especially with his temper, and he currently appears to have a degree of depression that would warrant some attention and possible treatment. He does have the capacity to understand simple instructions, He came to the evaluation site two days early just to be sure that he would be able to find his way here, so he has the ability to carry out simple instructions, but it is doubtful that he would be able to maintain attention and work at a fast pace. He currently has difficulty in relating to other people, and his judgment is inconsistent and often poor. It does appear that he is as capable now of managing his funds as he was before.

Tr. at 187.

On November 24, 1997, Plaintiff was seen for a physical examination by J.H. Sunderbruch, M.D. Tr. at 188–93. Plaintiff reported that he has pain all over, especially sharp in his back and neck. On physical examination, Plaintiff was described a "really quite normal" and the doctor wrote: "He demonstrates no disabilities in any of the physical exam." Tr. at 188. An x-ray of Plaintiff's lumbar spine was normal and unremarkable. Tr. at 190.

Plaintiff saw Dr. Frahm again on January 14, 1998, for the administration of psychological tests to assess his intellectual ability and his ability to read. Tr. at 194–95. On the Wechsler Adult Intelligence Scale–Revised (WAIS–R), Plaintiff scored a verbal IQ of 79, a performance IQ of 79, and a full scale IQ of 77 which placed him in the borderline range of mental retardation. Tr. at 194. Dr. Frahm wrote that Plaintiff's general fund of information was poor and his judgment, i.e. his ability to verbalize solutions to problems, was extremely limited. On the Wide Range Achievement Test–R, Level 2 Plaintiff demonstrated an ability to read at the first percentile or the beginning of the 5th grade. Plaintiff's ability to spell was assessed at .7 of the first percentile or the beginning of the third grade. On the other hand, Plaintiff's arithmetic ability was in the dull normal range. Tr. at 195. Dr. Frahm concluded his report:

> While Mr. Hansen has the numerical skills to add and subtract, and would thus be able to keep track of his money, I now believe he does not have the ability to manage his money, if funds are payable on his behalf. It appears that it will be essential to have a payee who could be sure that his basic necessities are taken care of. He does have the ability to remember and understand simple instructions, and under supervision, could carry out simple instructions, but he is not able to work quickly or stay focused and concentrate over a period of time. His ability to interact appropriately with others is also limited. His judgment is variable, with periods of very poor judgment, and he could not be depended on to make appropriate judgments to accommodate changes in a work situation. In addition to being of borderline mental abilities, he appears to be in a depressed state which could be part of an Adjustment Disor-

> der with Mixed Mood. He also appears to have a Personality Disorder, NOS

Tr. at 196.

Plaintiff was seen by a physical therapist at the University of Iowa on May 12, 1998, for an evaluation of his neck and low back symptoms. Range of motion testing revealed limited forward bending and backward bending in the thoracolumbar spine. Otherwise, the examination produced negative results. Tr. at 197.

Doctors at Disability Determination Services (DDS) who reviewed the medical records completed a Psychiatric Review Technique form (PRTF)(Tr. at 200–10) and a Mental Residual Functional Capacity Assessment form (Tr. at 211–17). On the PRTF, the doctors opined that Plaintiff suffers from borderline intellectual functioning based on his full scale IQ of 77 (Tr. at 204), and a personality disorder denominated "ASPD" which the Court will assume means Anti–Social Personality Disorder (Tr. at 205). The doctors opined that these impairments resulted in slight restrictions of daily living, moderate difficulties in maintaining social functioning, often deficiencies of concentration persistence or pace resulting in failure to complete tasks in a timely manner, and never episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms which may include deterioration of adaptive behaviors. Tr. at 207. On the mental residual functional capacity form, the doctors opined that Plaintiff is moderately limited in the following domains: The ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervi-

sion; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and, the ability to respond appropriately to changes in the work setting. Tr. at 211–12.

As stated above, Plaintiff waived his right to appear and testify at a hearing, and the ALJ submitted interrogatories to Marian Jacobs, vocational expert. Using a stress scale of 1 to 10, "1 being work similar to assembly work without production quotas and 10 being work similar to a very busy waitress during noon-hour rush, an air traffic controller, or a sales manager on a quota", the vocational expert classified Plaintiff's past work as a dish washer at a level 8. The vocational expert stated that Plaintiff is unable to return to his past work if he is restricted to lifting no more than 30 pounds occasionally and 15 pounds frequently. Tr. at 134. The vocational expert wrote that having "no more than superficial contact with the general public and limited contact with fellow workers" would not be a factor which preclude past relevant work. However, the vocational expert opined that three or more unexcused absences as well as "no contact with the general public" would preclude the past work. Tr. at 135. Because Plaintiff's past work was unskilled, the vocational expert said that he has no transferable skills. Tr. at 136. When asked to assume

that Plaintiff could lift no more than 30 pounds occasionally and 15 pounds frequently, and that he would be limited to simple routine, repetitive work (Tr. at 137), the vocational expert pointed to several examples of unskilled work that would be possible. The examples were: Addresser and document preparer which were in the sedentary exertional category, and laundry folder and labeler which were in the light category. Tr. at 144. The vocational expert said that the aforementioned jobs do not require contact with the general public and only limited contact with fellow workers. Tr. at 138. The vocational expert opined that 3 or more unscheduled absences per month would preclude competitive employment. The ALJ wrote:

> Assume for purposes of this question that an individual is a 34 years old, has an 11th grade education, and that he has a work background as set out in question 7 and 8. Assume also that the claimant has the following limitations: He does have the ability to remember and understand simple instructions, but he is not able to work quickly or stay focused and concentrate over a period of time. His ability to interact appropriately with others is also limited. His judgment is variable, with periods of very poor judgment, and he could not be depended on to make appropriate judgments to accommodate changes in a work situation. In addition to being of borderline mental abilities, he appears to be in a depressed state which could be part of an Adjustment Disorder with Mixed Mood. He also appears to have a Personality Disorder with Mixed Mood. He also appears to have a Personality Disorder, NOS. . . .

Tr. at 139. In response, the vocational expert responded: " . . . an inability to focus and concentrate on work tasks over a period of time would preclude all occupa-

tions ..." Tr. at 140. Finally, the ALJ asked the vocational expert to assume:

> ... He has not had any regular employment until he was in the residential corrections facility in a highly structured and supervised situation. He was able to maintain employment for several months as a dishwasher, but had trouble with co-workers and said he would have been fired if he had not quit. He has poor impulse control, especially with his temper, and he currently appears to have a degree of depression that would warrant some attention and possible treatment. He does have the capacity to understand simple instructions. He came to the evaluation site two days early just to be sure that he would be able to find his way there, so he has the ability to carry out simple instructions, but it is doubtful that he would be able to maintain attention and work at a fast pace. He currently has difficulty in relating to other people, and his judgment is inconsistent and often poor. It does appear that he is as capable now of managing his funds as he was before.

Tr. at 140. In response, the vocational expert said, in essence, that she was unable to answer the question of whether there would be unskilled jobs such a person could do because she was unable to predict future performance based on the few months Plaintiff had worked as a dishwasher. Tr. at 141.

In his decision, following the familiar five step sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 22, 1997. Tr. at 25. At the second step, the ALJ found that Plaintiff's severe impairments are complaints of low back pain, borderline intellectual functioning and personality disorder. At the third step, the ALJ found that Plaintiff's severe impairments do not meet or equal one listed in

Appendix 1, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is unable to perform his past relevant work. Tr. at 26. At the fifth step, the ALJ held that Plaintiff is able to do the types of jobs identified by the vocational expert at the administrative hearing. Tr. at 27. In making the fifth step finding, the ALJ found that Plaintiff has the residual functional capacity to work except for lifting more than 30 pounds occasionally and more than 15 pounds frequently, and that Plaintiff would be limited to simple, routine, repetitive work in which he would have no more than superficial contact with the general public and limited contact with fellow workers. Tr. at 26. The ALJ found that Plaintiff was not disabled and was not entitled to the benefits for which he applied. Tr. at 27.

The February 17, 1994 decision is in the record at pages 44 to 56. In this decision, the ALJ (J. Michael Johnson) found that psychological testing showed that Plaintiff's IQ was in the mildly mental retarded range (Verbal IQ of 73, Performance IQ of 60, and Full Scale IQ of 70). In addition, Plaintiff had, according the ALJ's decision, been in an automobile accident in February, 1991. A consultative physical examination showed that Plaintiff was limited in his ability to lift, and thus his back impairment was a severe impairment which, in combination with his low intellectual functioning met the requirement of a listed impairment (12.05C). Plaintiff was, therefore, found to be disabled. Tr. at 50. A list of the medical records before Judge Johnson appears in the record at pages 55–56 although the actual records do not. The list of exhibits shows that, among other things, Judge Johnson considered scholastic records from Clinton, Iowa schools, and a psychological evaluation by Julian M. Burn, Ph.D.

## 1060

### DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

■ In *Muncy v. Apfel*, 247 F.3d 728 (8th Cir.2001), the Court remanded the case to resolve a twenty-five point difference in IQ scores from tests several years apart. In the case at bar, Plaintiff's IQ scores at the time of the 1992 application were 69, 70 and 73. Along with a severe impairment, the ALJ determined that Plaintiff qualified for benefits at the third step of the sequential evaluation. At the time of the 1997 application, however, Plaintiff was tested by a different psychologist, and he scored between 6 and 10 points higher, placing him in the borderline range of intelligence, above the listings level. As in *Muncy*, the ALJ made no effort to resolve the conflicting medical evidence on this point. At a minimum, therefore, a remand is required to determine why the earlier IQ scores should not be adopted as the controlling scores, which along with the severe personality disorder would meet the requirements of the Listings for mental retardation. Other substantial evidence, however, convinces the Court that a remand for further development is unnecessary.

■ The ALJ found that Plaintiff is unable to do his past work as a dishwasher—the only job that Plaintiff ever held, and that for only 5 months. The burden of proof, therefore, shifted to the Commissioner to prove with medical evidence that Plaintiff has a residual functional capacity to perform other work and that other work exists in significant numbers in the national economy that the claimant can perform. *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir.2000) citing *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir.1982)(en banc), and *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir.1983). *See also Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000), citing *Nevland*; *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir.2001).

■ In making the finding of residual functional capacity, an ALJ may consider non-medical evidence, however the residual functional capacity finding must be supported by some medical evidence. *Lauer*. Furthermore, in *Jeffcoat v. Bowen*, 840 F.2d 592, 596 (8th Cir.1988), the Court held that it was error for the ALJ to give more weight to non-medical evidence than to medical evidence and thus the residual functional capacity finding did not reflect real world work capability.

In the opinion of the Court, the ALJ in the case sub judice relied more on nonmedical evidence than on the medical opinion expressed by the psychologists who examined Plaintiff and who reviewed the documentary evidence. Among the nonmedical evidence that the ALJ pointed to was the fact that Plaintiff worked as a dishwasher for five months, and the fact that he made statements to the effect that he intended to go back on disability rather than seek employment. In the opinion of the Court, the fact that Plaintiff worked as a dishwasher for five months while living in a highly structured and supervised situation, does not reflect his real world capabilities.

After two clinical interviews and the administration of psychological tests, Dr. Frahm opined that Plaintiff's judgment is inconsistent and often poor, that he is unsocialized and does not get along with others, and often has trouble with his temper. Dr. Frahm was clear that Plaintiff cannot be depended upon to make appropriate judgments in a work situation. Even in the highly structured and supervised situation, Plaintiff had trouble with co-workers, and the minute the supervision of the correctional facility was removed, Plaintiff was no longer able to maintain employment—even in the face of having his utilities shut off for failure to pay. In addition, the doctors selected by the Disability Determination Services identified numerous areas in which Plaintiff would be moderately limited, not the least of which were the ability to sustain an ordinary routine without special supervision, the ability to complete a normal work day or work week, the ability to get along with coworkers without exhibiting behavioral extremes, and the others that were listed above. These are the very types of factors that the vocational expert, in her answers to the interrogatories, identified as impediments to competitive employment. One cannot help but recall the admonition given in *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980): "Employers are concerned with substantial capacity, psychological stability, and steady attendance." The Court in *Rhines* went on to state: "The Secretary need not find a specific job for a claimant. However, it must be shown that claimant can realistically perform in existing employment." As in *Rhines,* the Commissioner has failed to make the requisite showing in this case.

■ Because substantial evidence supports a finding that Plaintiff is unable to function in competitive employment, a remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. In such circumstances, a reversal with an award of benefits is the appropriate remedy. *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir. 1987).

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to affirm the Commissioner's final decision is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78

F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.